Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, California 92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| BILLY PETER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANNE E. LOPEZ, IN HER OFFICIAL | ) | Civil Action No. _____ |
| CAPACITY AS THE ATTORNEY | ) | VERIFIED COMPLAINT |
| GENERAL OF THE STATE OF | ) | |
| HAWAII, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW the Plaintiff, BILLY PETER, by and through his undersigned counsel, and complains of the Defendant as follows:

## I

## PARTIES

**Plaintiff**

1.  Plaintiff BILLY PETER (hereinafter "Peter") is a natural person, an adult male, over the age of 18, a resident of the State of Hawaii, residing in Honolulu County and is a citizen of the Federated States of Micronesia. But for the actions of State of Hawaii (hereinafter "State"), challenged in this lawsuit, he intends to and would have a permit to acquire (hereinafter "PTA"), and would be able to acquire, purchase, own, and possess a firearm;

**Defendant**

2.  Defendant Anne E. Lopez is the Attorney General of the State of Hawaii and is sued in her official capacity and is responsible for enforcing the State of Hawaii's customs, policies, practices and laws related to the State of Hawaii on the acquisition, sale, purchase, ownership and possession of firearms and criminal laws including those related to the acquisition, sale, purchase, ownership and possession of firearms and ammunition. Defendant Lopez may be served at the Office of Attorney General located at 425 Queen St, Honolulu, Hawaii 96813;

## II

## JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988;

4.  Venue lies in this Court pursuant to 28 U.S.C. § 1391;

## III

## INTRODUCTION

5.  This action challenges the constitutionality of State's laws that prohibits the

acquisition, purchase, sale, ownership, and possession of firearms[1] by persons who

legally live in the United States pursuant to a Compact of Free Association

("COFA");

6. State's prohibition of firearm acquisition, ownership, and possession, by COFA

aliens makes it impossible for those individuals to exercise their right to "keep

arms", as guaranteed by the Second Amendment's text and as recognized and

reaffirmed by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v.*

*Bruen*, 142 S. Ct. 2111 (2022);

---

[1] Plaintiff also challenges the denial of the acquisition and ownership of firearms
through the prohibition of the issuance of "permits to acquire", hereinafter "PTA",
referenced in HRS §134-2, for firearms to adults who are not United States
citizens, nationals or lawful permanent residents.

7.  State's prohibition of firearm acquisition, ownership, and possession, by COFA aliens, violates the Equal Protection Clause of the 14th Amendment because it treats COFA aliens differently solely based on their status as COFA aliens.

8.  The main policies, actions, laws and customs that Plaintiff targets and alleges are unconstitutional here are-

A. Hawaii Revised Statutes, (hereinafter "HRS"), §134-2 (a), as it applies to HRS §134-2(d)(1);

> HRS §134-2(a) reads-
>
> §134-2  Permits to acquire.  (a) No person shall acquire the ownership of a firearm, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior law or by a prior owner or unregistered, either by purchase, gift, inheritance, bequest, or in any other manner, whether procured in the State or imported by mail, express, freight, or otherwise, until the person has first procured from the chief of police of the county of the person's place of business or, if there is no place of business, the person's residence or, if there is neither place of business nor residence, the person's place of sojourn, a permit to acquire the ownership of a firearm as prescribed in this section. When title to any firearm is acquired by inheritance or bequest, the foregoing permit shall be obtained before taking possession of the firearm; provided that upon presentation of a copy of the death certificate of the owner making the bequest, any heir or legatee may transfer the inherited or bequested firearm directly to a dealer licensed under section 134-31 or licensed by the United States Department of Justice without complying with the requirements of this section.

B. HRS §134-2(d)(1), which reads-

> (d) The chief of police of the respective counties shall issue permits to acquire firearms to: (1) *Citizens, nationals, or lawful*

**permanent residents of the United States** of the age of twenty-one years or more[2];

C. HRS §134-2 (h), which reads-

(h) No person shall sell, give, lend, or deliver into the possession of another any firearm except in accordance with this chapter.[3]

9. Plaintiff respectfully requests that this Court: (i) declare, facially (to the extent these laws impact COFA aliens) and as applied to Plaintiff, that HRS §§134-2(a), 134-2(d)(1), and 134-2(h), and Defendant's policies and practices of enforcing those laws, which prohibits adults who are not citizens of the United States, nor nationals or lawful permanent residents, from acquiring, purchasing, and owning and or possessing any firearm, as unconstitutional infringements of Plaintiff's constitutional rights under the Second and Fourteenth Amendments of the United States Constitution; and (ii) permanently enjoin Defendant from enforcing the aforementioned HRS, both facially (to the extent these laws impact COFA aliens) and as applied to Plaintiff, and thereby allow others similarly situated, to acquire, purchase, own, transfer and possess firearms to adults who are not United States citizens, nationals or lawful permanent residents to defend themselves, their families, and their homes and for all other lawful purposes;

---

[2] Plaintiff, in this lawsuit, does not challenge the "of the age of twenty-one years or more" aspect of this statute-only the limitation to citizens, nationals and or lawful permanent residents restriction.

[3] As this statute applies to Hawaii Revised Statute §134-2(d)(1).

IV

## HAWAII FIREARM LAW BACKGROUND

10.  In anticipation of bad-faith efforts to obstruct its ruling in recalcitrant

jurisdictions, the *Bruen* Court expressly invited challenges such as this one,

noting that, "because any permitting scheme can be put toward abusive

ends, we do not rule out constitutional challenges to shall-issue regimes

where, for example, lengthy wait times in processing license applications

or exorbitant fees deny ordinary citizens their right to public carry." *Id*.

The policies that Plaintiff challenges[4] have gone far beyond

"abus[ing]"constitutional rights. Defendant has flat-out denied

Plaintiff[5] his rights to be armed inside and outside of his home by establishing an

onerous permitting regime replete with subjective and discretionary decisions, poll

tax-like fees, and *as applicable to this lawsuit*, an outright ban on the acquisition,

---

[4] Despite Hawaii's comprehensive statutory denial and infringement of Second
Amendment rights, this lawsuit _only_ attacks the aspect of adults who are not
United States Citizens, United States Nationals or lawful permanent residents
being statutorily prohibited from being "granted" a permit to acquire, and also
from purchasing, owning and possessing firearms and also from authorized persons
from selling firearms to "non-citizen adults". *See* FN's 1-4.
[5] And any other adult who is lawfully within the United States but who is not a
United States citizen, national or lawful permanent resident.

sale, purchase, ownership and possession of firearms by adults who are not citizens of the United States or nationals or lawful permanent residents;

11.  There is no exception to HRS §134-2(d)(1), or any other Hawaii Revised Statute, to allow an adult who is not a United States citizen, national or lawful permanent resident to acquire or own a firearm without a PTA when the adult would acquire a firearm through inheritance;

12. There is no exception to HRS §134-2(d)(1), or any other Hawaii Revised Statute, to allow an adult "non-citizen" to acquire or own a firearm without a PTA when the adult "non-citizen" would acquire or own a firearm through intra-familial transfer;

13. There is no exception to HRS §134-2(d)(1), or any other Hawaii Revised Statute, would allow an adult "non-citizen" to acquire or own a firearm without a PTA when the adult "non-citizen" would acquire or own the firearm due to it being a gift;

14.  HRS §134-4 Transfer, Possession of Firearms, (c), reads, in pertinent part,-

> (c)  Any lawfully acquired rifle or shotgun may be lent to an adult for use within the State for a period not to exceed fifteen days without a permit; provided that where the rifle or shotgun is to be used outside of the State, the loan may be for a period not to exceed seventy-five days;

15. HRS §134-5, reads, in relevant part- §134-5 Possession by licensed hunters and minors; target shooting; game hunting.

(a)  Any person of the age of sixteen years, or over or any person under the age of sixteen years while accompanied by an adult, may carry and use any lawfully acquired rifle or shotgun and suitable ammunition while actually engaged in hunting or target shooting or while going to and from the place of hunting or target shooting; provided that the person has procured a hunting license under chapter 183D, part II.  A hunting license shall not be required for persons engaged in target shooting.

(b)  A permit shall not be required when any lawfully acquired firearm is lent to a person, including a minor, upon a target range or similar facility for purposes of target shooting; provided that the period of the loan does not exceed the time in which the person actually engages in target shooting upon the premises.

16. HRS §134-17 reads in pertinent part, Penalties…. (b) Any person who violates:

(1) Section 134-2, 134-4, 134-10, 134-13(c), or 134-15 shall be guilty of a misdemeanor;

17.  HRS §134-7(j) reads-

(j) Any person violating subsection (a) or (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony. Any person violating subsection (c), (d), (e), (f), (g), or (h) shall be guilty of a misdemeanor;

18.  HRS §134-11, exemptions, are not applicable to this lawsuit;

19.  8 U.S.C. §1101 (a)(3) provides - The term "alien" means any person not a

citizen or national of the United States;

20.  8 U.S.C. §1101 (a) (22) provides - The term "national of the United States" means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States;

21. 8 U.S.C. §1255 provides - (a) Status as person admitted for permanent residence on application and eligibility for immigrant visa.  The status of an alien who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification as a VAWA self-petitioner may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed;

22.  The United States Constitution, Fourteenth Amendment provides - All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.

23.  The Compact of free Association between the Unites States of America and the Federated States of Micronesia, Section 141 provides-

Section 141
(a) Any person in the following categories may enter into, lawfully engage in occupations, and establish residence as a nonimmigrant in the United States and its territories and possessions without regard to paragraphs (14), (20), and (26) of

section 212(a) of the Immigration and Nationality Act, 8 U.S.C. 1182(a) (14), (20), and (26): (1) a person who, on the day preceding the effective date of this Compact, is a citizen of the Trust Territory of the Pacific
Islands, as defined in Title 53 of the Trust Territory Code in force on January 1, 1979, and has become a citizen of the Marshall Islands or the Federated States of Micronesia; (2) a person who acquires the citizenship of the Marshall
Islands or the Federated States of Micronesia at birth, on or after the effective date of the respective Constitution;
(3) a naturalized citizen of the Marshall Islands or the Federated States of Micronesia who has been an actual resident there for not less than five years after attaining such naturalization and who holds a certificate of actual residence; or (4) a person entitled to citizenship in the Marshall Islands by lineal descent whose name is included in a list to be furnished by the Government of the Marshall Islands to the United States Immigration and Naturalization Service and any descendants of such persons, provided that such person holds a certificate of lineal descent issued by the Government of the Marshall Islands.
Such persons shall be considered to have the permission of the Attorney General of the United States to accept employment in the United States.
(b) The right of such persons to establish habitual residence in a territory or possession of the United States may, however, be subjected to nondiscriminatory limitations provided for:
(1) in statutes or regulations of the United States; or
(2) in those statutes or regulations of the territory or possession concerned which are authorized by the laws of the United States.
(c) Section 141(a) does not confer on a citizen of the Marshall Islands or the Federated States of Micronesia the right to establish the residence necessary for naturalization under the Immigration and Nationality Act, or to petition for benefits for alien relatives under that Act. Section 141(a), however, shall not prevent a citizen of the Marshall Islands or the Federated States of Micronesia from otherwise acquiring such rights or lawful permanent resident alien status in the United States.

**V**

## **STATEMENT OF LAW**

**A**

## **SECOND AMENDMENT**

24. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.";

25. The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 1027 (2016); *NYSRPA v Bruen,* 597 U.S. 1, 142 S. Ct. 2111 (2002);

26. The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

27. In *Bruen*, the Supreme Court held unconstitutional New York's "good cause" licensing requirement because a State may not condition the right to publicly carry handguns on a citizen's "special need for self-defense." *Bruen*, 142 S.Ct. at 2135 n.8;

28. The "general right to public carry" cannot be restricted absent "*exceptional* circumstances." *Bruen*, 142 S. Ct. at 2156 (emphasis added). This is because the Second Amendment "presumptively protects" carrying firearms. *Id.* At 2129. To determine whether a state's restriction is constitutional, the Court in *Bruen*

explained that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129. If the right to carry cannot be restricted absent "exceptional circumstances" then certainly the right to acquire, own and possess similarly is presumptively protected from restriction, and an outright ban is unconstitutional.  Being a COFA alien is not an "exceptional circumstance";

29.  It is the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127; *see also id.* At 2150 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). If the State fails to meet its burden, then the State's restrictions must be enjoined;

30.  The *Bruen* Court struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. In doing so, *Bruen* explicitly rejected New York's attempt to justify its restriction as analogous to a historical "sensitive place" regulation. 142 S.Ct. at 2133-34. The Court explained that a state may not simply ban guns wherever people may "congregate"

or assemble. A rule that "expand[ed] the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." 142 S. Ct. at 2134. As the Court explained, "[p]ut simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id;*

31. The Fourteenth Amendment to the United States Constitution provides in pertinent part: No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws;

32. The Supreme Court has defined all of the Second Amendment's key terms. "The people" means, at a minimum, "all Americans"; "Arms" includes "all instruments that constitute bearable arms"; *Heller*, 554 U.S. at 580–82,;

33. "We turn to the phrases 'keep arms' and 'bear arms'. Johnson defined 'keep' as, most relevantly, '[t]o retain; not to lose,' and '[t]o have in custody.' Johnson 1095. Webster defined it as '[t]o hold; to retain in one's power or possession.' No party has apprised us of an idiomatic meaning of "keep Arms." Thus, the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons' *Heller*, 554 U.S. at 582;

34. In *Jackson*, the Ninth Circuit found that ammunition is protected by the Second Amendment, and one thus has a right to purchase it. "'[T]he right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014) (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011);

35. "[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cty. of Alameda,* 873 F.3d 670, 677 (9th Cir. 2017). For this reason, the right to keep and bear arms includes the right to purchase them. And thus, laws that burden the ability to purchase arms burden Second Amendment rights. *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022), opinion vacated on reh'g, 47 F.4th 1124 (9th Cir. 2022);

36. *Heller* established a "text, history, and tradition" framework for analyzing Second Amendment questions. *See United States v Rahimi, 144 S.Ct. 1889 at 1897. See also Bruen*, 142 S. Ct. at 2127-29, citing *Heller*, 554 U.S. at 634. Under that framework, the *Heller* Court assessed historical evidence to determine the prevailing understanding of the Second Amendment at the time of its ratification in 1791. Based on that assessment, the Court concluded that the District of Columbia statute which prohibited possession of the most common type of firearm in the nation (the handgun) lacked a Revolutionary-era tradition, did not comport with

the historical understanding of the scope of the right, and therefore violated the

Second Amendment;

37.  When examining a challenged law, the court must consider the relevant time

period and the court must look to relevantly similar historical analogues that also

explain the how and why and keep in mind that our forefathers would have never

have accepted certain legislation[6].  Some legislation would have never been

accepted and thus is off the table for consideration.  The Founding Fathers framed

a limited government[7], and vastly *expanded* the right to keep and bear arms in

---

[6] How the British Gun Control Program Precipitated the American Revolution, *David B. Kopel,* Charleston Law Review, Volume 6 Winter 2012 Number 2, "We can discern that broad attempts to disarm the people of a town, or to render them defenseless, are anathema to the Second Amendment; such disarmament is what the British tried to impose, and what the Americans fought a war to ensure could never again happen in America. Similarly, gun licensing laws that have the purpose or effect of allowing only a minority of the people to keep and bear arms would be unconstitutional." *Id* at 285-286.

[7] Some rights, like the right to keep and bear arms were so broad in nature, there were some who felt that the Constitutional amendments were unnecessary because they could not see any government infringing upon those rights.  *See* Federalist Papers 84.

America[8].  Laws of the time[9] did not control people nor arms, but sought to, as today, punish criminal acts and only act in a prophylactic manner under very limited circumstances.  So, there were laws prohibiting intoxicated carrying of arms and the temporary disarmament of those adjudicated to be insane and thus dangerous[10].

38. The relevant time period to examine to determine if there are any relevantly similar analogues that limit Second Amendment rights in the same way is 1791.

_____

[8] *See Passages of Arms: The English Bill of Rights and the American Second Amendment*, University of Nebraska-Lincoln, Nebraska law Review, Christopher D. Carrier, September 5, 2021, a review discussing Professor Schwoerer and Professor Malcolm, with Schwoerer arguing that despite widespread firearm ownership in England, England sought to restrict firearm possession, "She argued that there was no intent to create a right, and no such effect, in that the three forms of restriction (Protestantism, socioeconomic "condition," and the crucial qualifier "as allowed by law") vitiated any real effect in the form of widespread individual gun ownership."  The Second Amendment contains no such qualifiers.  One common thread did remain, and that was a focus on the "use" of a gun, not the mere possession of it. "Indeed—and the condemnation was on the *use* of the firearms, not the possession of them."  *Id.*

[9] That the Founders would have accepted.  Parliamentary acts, cited *infra*, that served as the catalyst for the American Revolution and the Second Amendment are examples of the *kinds* of laws that the Founders found unacceptable- unacceptable enough to start a revolution.

[10] A 1774 American treatise on the liberties belonging to English subjects included an example of a warrant to secure a lunatic for constables, churchwardens, and overseers of the poor that allowed two justices of the peace to detain individuals by lunacy so disordered in their senses, that he is dangerous to go abroad. *See* 1788 N.Y. Laws Ch. 12.,  and, a1655 Virginia law prohibiting the shoot[ing] any guns at drinkeing, a 1771 New York law banning shooting guns around New Year's to prevent the great Damages frequently done by persons  intoxicated with Liquor; 1655 Va. Acts 401, Acts of March 10, 1655; 1771 Colonial Laws of New York.

*See Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122, 134 (3d Cir. 2024), cert. granted, judgment vacated sub nom. *Paris v. Lara*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024) (Footnotes omitted) ("the Second Amendment should be understood according to its public meaning in 1791."). *See also*, *United States v. Connelly*, --- F.4th ----, 2024 WL 3963874 at *9 (5th Cir. Aug. 28, 2024) ("Offering three laws passed scores of years post-Ratification (and a fourth passed nearly half a century beyond that) misses the mark by a wide margin."). *See also Mark Smith*[11]*, "*No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791."

39.  It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution. *Frost & Frost Trucking Co. v. Railroad Comm'n of California*, 271 U.S. 583, 593-94 (1926).  "Constitutional rights would be of little value if they could be . . .

---

[11] Smith, Mark W., *'Not All History Is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868* (October 1, 2022). Available at SSRN: https://ssrn.com/abstract=4248297 or http://dx.doi.org/10.2139/ssrn.4248297

indirectly denied" (*Smith v. Allwright*, 321 U.S. 649, 664 (1944)), or

"manipulated out of existence." *Gomillion v. Lightfoot*, 364 U.S. 339, 345

(1960). "Significantly, the Twenty- Fourth Amendment does not merely

insure that the franchise shall not be 'denied' by reason of failure to pay the

poll tax; it expressly guarantees that the right to vote shall not be 'denied or

abridged' for that reason." *Harman v. Forssenius*, 380 U.S. 528, 540 (1965)

(citation omitted). Thus, like the Fifteenth Amendment, the Twenty-Fourth

"nullifies sophisticated as well as simple-minded modes" of impairing the

right guaranteed. *Lane v. Wilson*, 307 U.S. 268, 275 (1939). " 'It hits

onerous procedural requirements which effectively handicap exercise of the

franchise by those claiming the constitutional immunity.' " *Harman*, 380

U.S. at 540-41 (citations omitted), quoting *Lane*, at 275;

40.  *Bruen* further establishes several requirements to determine whether a

historical regulation is sufficiently analogous. First, the relevant time period for the

historical analogue must be the Founding, centering on 1791. *Bruen*, 142 S.Ct. at

2135-36. That is because "'[c]onstitutional rights are enshrined with the scope they

were understood to have when the people adopted them.'" *Bruen*, 142 S.Ct. at

2136, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008).  "20th

century and late 19th century statutes and regulations "cannot provide much insight

into the meaning of the Second Amendment when it contradicts earlier evidence."

*Bruen*, 142 S.Ct. at 2154 & n.28;

41.  Thus, restrictions on the right to keep and bear arms dating after the Civil War and after the adoption of the Fourteenth Amendment in 1868 may be confirmatory of earlier legislation but cannot be used alone to provide the appropriate historical analogue required by *Bruen*[12].  Legislation, history and events following the Civil war can confirm but cannot limit, reduce or infringe upon the rights as understood in 1791.  In other words, only those restrictions with roots at the time of the Founding are sufficiently "enduring" and "well-established" to comport with the Second Amendment's "unqualified command." *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961));

42.  Second, the historical analogue must be "representative." Historical "outlier" requirements of a few jurisdictions or of the Territories are to be disregarded. *Bruen*, 142 S.Ct. at 2133, 2153, 2147 n.22 & 2156.  Courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so

---

[12] Note that the Reconstruction Period, generally from approximately 1865-1877, involved federal troops in the south, followed by the passage of Black Codes and then Jim Crow laws, such laws extending long into the 20th century, and the passage of Constitutional amendments trying to ensure basic constitutional rights to newly freed slaves.  That time period was not typical nor traditional and could not have lessened the rights as understood from 1791.  Constitutional acts, in the late 1800's, meant to ensure newly freed slaves the rights, understood by the founders in 1791, in the Constitution, including the right to keep and bear arms, confirm the breadth and scope of the Second Amendment.

"risk[s] endorsing outliers that our ancestors would never have accepted."

*Drummond v. Robinson,* 9 f.4th 217 (3rd. Cir 2021),- individual self-defense is the

central component of the Second Amendment right;

43.  Also, the historical analogue must be "relevantly similar," which is to say that

it must burden ordinary, law-abiding citizens right to carry in a similar manner and

for similar reasons. *Bruen*, 142 S. Ct. at 2132.  *Bruen* thus held that the inquiry into

whether a proper analogue exists is controlled by two "metrics" of "how and why"

any restriction was historically imposed during the Founding era.  *Id.* at 2133.

"[W]hether modern and historical regulations impose a comparable burden on the

right of armed self-defense and whether that burden is comparably justified are

"'*central*'" considerations when engaging in an analogical inquiry." *Id.* (emphasis

in original). "[T]o the extent later history contradicts what the text says, the text

controls." *Id.* at 2137. "Thus, 'postratification adoption or acceptance of laws that

are inconsistent with the original meaning of the constitutional text obviously

cannot overcome or alter that text.'" *Id*., quoting *Heller v. District of Columbia*,

670 F.3d 1224, 1274, n.6 (Kavanaugh, J., dissenting);

44.  Also, the historical analysis required by the Supreme Court is fundamentally a

legal inquiry that examines legal history, which is appropriately presented in briefs.

*See Bruen*, 142 S. Ct. at 2130 n.6 (noting that the historical inquiry presents "legal

questions" that judges can address) (emphasis in original); *see also id.* at 2135 n.8

(rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend on any of the factual issues raised by the dissent"). Accordingly, the required analysis does not require fact-finding by a court;

45.  The text of the Second Amendment, as authoritatively interpreted by the Supreme Court, indisputably covers possession (keep) and the wear, carry, and transport (bear) of firearms, including handguns by ordinary, law-abiding citizens. The Government bears the burden to demonstrate that there is an enduring, well-established, representative historical analogue to the restriction imposed by the government. And the historical analogue must be "relevantly similar" to the contemporary restriction imposed by the government, burdening the Second Amendment right in a similar manner and for similar reasons. Under this test established in *Bruen*, the State cannot meet its burden to justify its denial in the issuance of PTA permits for the Plaintiff, nor of the prohibition on the ownership, purchase, sale and possession of firearms for those who are not citizens, nationals or lawful permanent residents.  There is no historical analogue of prohibition for adults who are COFA aliens[13];

---

[13] There is also no historical analogue allowing the government to infringe on being able to acquire, buy, sell, possess or own arms through a licensure or permitting process at all or with any delay. However, Plaintiff does not challenge the constitutionality of the PTA in this lawsuit, nor do he concede such permits are constitutionally permissible.

46.  In *Fotoudis v. City & County of Honolulu*, 54 F. Supp. 3d 1136, this Court enjoined H.R.S. § 134-2's prohibition on noncitizen's owning firearms as applied to permanent resident aliens i.e. green card holders. After the *Fotoudis* ruling, Hawaii maintained a ban on other noncitizen residents of Hawaii. This included U.S. Nationals from the U.S. Territory of America Samoa until a lawsuit was filed. Shortly after the filing of that lawsuit, the State entered into a stipulated injunction which compelled Hawaii to allow U.S. Nationals to own firearms. See *Alanoa Nickel v. Clare E. Connors*, et al.1:20-cv-00330-JMS-RT Doc. No. [22] (stipulated injunction as to State of Hawaii's ban on U.S. Nationals owning firearms).  Shortly after the *Fotoudis* ruling, Honolulu entered a settlement regarding its own restrictions on green card holders.  See *Roberts v. City of Honolulu*, 938 F.3d 1020, 1022 (9th Cir. 2019).  See also *Roberts v. Connors*; et al., 1:19CV00165 Doc. No. [25] (settlement which allowed green card holder to apply for a carry license).

47. This Court and others have already found that permanent resident aliens lawfully residing in the United States are among the people. "[I]nterpreting § 134–2(d) to deny Fotoudis the opportunity to apply for (and to obtain, if otherwise qualified) a permit to acquire firearms, solely because he is not a U.S. citizen, also violates the Second Amendment." *Fotoudis v. City & Cnty. of Honolulu*, 54 F. Supp. 3d 1136, 1143 (D. Haw. 2014).  "Mr. Ibrahim falls within that class of people who have developed a sufficient connection with this country to be

considered part of that community. He is a legal alien and before now had no

convictions." *State v. Ibrahim,* 164 Wash. App. 503, 514, 269 P.3d 292, 296

(2011). "Fletcher and Pryal, who are both lawful permanent residents, have plainly

satisfied the "sufficient connection" test of *Verdugo–Urquidez*." *Fletcher v. Haas*,

851 F. Supp. 2d 287, 301 (D. Mass. 2012).[14]Here, there is no meaningful

difference between a permanent legal alien and a COFA alien, especially in the

case of Plaintiff. Plaintiff has lived here on a long-term basis and plans on living

here for the rest of his life.

## **B**

## **Equal Protection Clause**

48.    Plaintiff realleges and incorporates the previous paragraphs by reference.

49.    Alienage, or the state of being an alien, i.e. a non-citizen of the United States,

is a suspect class that triggers strict scrutiny in equal protection claims when

---

[14] Prior to *Bruen*, the 7th Circuit even found unlawful aliens within the definition of the People. *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015). However, it ultimately upheld the ban on unlawful aliens under means end scrutiny. Post-*Bruen*, several trial courts have found the federal ban on unlawful aliens owning firearms violates the Second Amendment. *United States v. Carbajal-Flores*, No. 20-CR-00613, 2024 WL 1013975, at *4 (N.D. Ill. Mar. 8, 2024). *See also United States v. Sing-Ledezma*, No. EP-23-CR-823(1)-KC, 2023 WL 8587869, at *18 (W.D. Tex. Dec. 11, 2023). *UNITED STATES OF AMERICA, Plaintiff, v. PEDRO MUNOZ BENITO, Defendant*., No. 3:24-CR-26-CWR-ASH, 2024 WL 3296944, at *8 (S.D. Miss. July 3, 2024). However, the last two decisions have been abrogated by *United States v. Medina-Cantu*, 113 F.4th 537 (C.A.5 (Tex.), 2024) which upheld 18 U.S.C. § 922(g)(5).

dealing with state law. *Graham v. Richardson*, 403 U.S. 365 (1971).[15]  Under HRS

§ 134-2(d), COFA aliens are prohibited from owning firearm whereas citizens and

other legal immigrants and nonimmigrants can. While there are exceptions for

some visiting aliens those exceptions do not apply to COFA aliens such as

Plaintiff. Section 134-2(d) is thus not "facially neutral legislation." *See Washington*

*v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 484, 102 S. Ct. 3187, 73 L. Ed. 2d 896

(1982) ("[W]hen facially neutral legislation is subjected to equal protection attack,

an inquiry into intent is necessary[.]").  HRS § 134-2(d) explicitly treats COFA

aliens differently than U.S. citizens solely because of their status as aliens.  Even if

rational basis review applied, Hawaii's restriction on COFA aliens is

unconstitutional because it discriminates against COFA aliens without a legitimate

reason. *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). The

legislature's desire to "protect" favored groups' "expectations" or "respond to the

demands of a political constituent" is not a cognizable state interest. See also

*Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016) (reversing

dismissal of an equal protection claim given arbitrary "carve out[s]" to select

groups);

---

[15] "In general, state classifications based on alienage are subject to strict scrutiny."
*Korab v. Koller*, No. CIV. 10-00483 JMS, 2010 WL 4688824, at *4 (D. Haw. Nov.
10, 2010) (Collecting cases).

50. Classifications based on alienage are "suspect" for purposes of analyzing a violation of the Equal Protection clause and are subject to "strict judicial scrutiny whether or not a fundamental right is impaired." *See Fotoudis v. City & Cnty. of Honolulu*, 54 F. Supp. 3d 1136, 1142 (D. Haw. 2014).  1142. Thus, strict scrutiny applies, and the State of Hawaii must demonstrate a compelling government interest that is narrowly tailored to achieve that interest. *See Thomas v. Review Bd. of Ind.do Employment Sec. Div.*, 450 U.S. 707, 718 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest."). Applying strict scrutiny, denying Plaintiff the opportunity to apply for (and to obtain) a permit that is necessary under current Hawaii law to acquire, own and possess a firearm merely because he is a COFA alien "is not a narrowly tailored means of achieving that goal." *Smith v. South Dakota*, 781 F. Supp. 2d 879, 886 (D.S.D. 2011) (citing *Application of Griffiths*, 413 U.S. 717, 725, 93 S. Ct. 2851, 37 L. Ed. 2d 910 (1973) (rejecting the argument that 'the possibility that some resident aliens are unsuited to the practice of law' could be a 'justification for a wholesale ban'"). *See also Fletcher v. Haas*, 851 F. Supp. 2d 287, 303 (D. Mass. 2012).

51.    The citizenship requirement in HRS §134-2, and all other Hawaii statutory language, which restricts noncitizen U.S. COFA immigrant and nonimmigrants the

rights and privileges of owning firearms based on citizenship, on their face and as-applied, are unconstitutional denials of equal protection of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## STATEMENT OF LAW

## C

## H.R.S. §134  Firearms

52. Hawaii law, specifically Hawaii Revised Statutes Section 134 *et seq*, is a comprehensive set of laws covering all aspects of firearms in Hawaii including everything from acquisition, possession, ownership, usage and carriage of arms[16];

53.  Following *Bruen*, the state of Hawaii promulgated new laws regarding firearms, making all aspects of the exercise of Second Amendment rights much more difficult, onerous and expensive;

54.  Hawaii's ban on adults who are not citizens, nationals or lawful permanent residents not being able to get a PTA is not long-established, having been put in place in 1994;

## VI

---

[16] Hawaii state laws regarding all aspects of the Second Amendment and firearms are thorough, oppressive, and comprehensive.  Yet, Hawaii does not have an explicit preemption law that limits regulation to the state and in several circumstances allows or mandates that counties promulgate additional regulations, restrictions and processes.  HRS §134 et seq is attached as Exhibit 1.

## <u>CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNITED STATES CONSTITUTION AMENDMENT II RIGHT TO BEAR ARMS 42 U.S.C. §1983</u>

55. Plaintiff hereby re-alleges and incorporates by reference the allegations in the forgoing paragraphs as if set forth fully herein;

56. Plaintiff does not concede that any Hawaii Revised Statute is constitutional;

57. Plaintiff alleges that State's prohibition against the acquisition, purchase, ownership and possession of firearms by adults who are "non-citizens", COFA aliens, and the prohibition against granting of PTA to adults who are "non-citizens", COFA aliens, has violated his Second Amendment and Fourteenth Amendment U.S. Constitutional rights;

58. Following the *Bruen* decision, Hawaii, erected onerous laws, customs, policies and practices that are designed to delay, deprive and infringe upon the exercise of Second Amendment rights for as long as possible. Although State's firearm prohibition for adults who are not citizens, nationals or lawful permanent residents preceded *Bruen,* Hawaii has not repealed its law. In fact, Hawaii has been sued regarding similar non U.S. citizens already and has still not repealed this aspect of the law (see Paragraphs 46-54);

59. In *Cooper v. Aaron,* 358 U.S. 1 (1958), the Supreme Court was confronted with similar bureaucratic foot dragging in implementing public school integration.

Given the open defiance of the Supreme Court's opinion in *Brown I*[17] and *Brown II*,[18] the Court did not tolerate finger-pointing, simply observing that "delay in any guise in order to deny . . . constitutional rights.. . could not be countenanced, and that only a prompt start, diligently and earnestly pursued . . . could constitute good faith compliance." 358 U.S. at 7.

60.  Plaintiff does not concede that a PTA to acquire, buy, or own a firearm is constitutional.  In fact, 41 states do not require any permit or license to acquire, own or buy a long gun, and 38 states do not require any permit or license to acquire, own or buy a pistol;

**A**

**<u>Plaintiff Billy Peter</u>**

61.  Plaintiff Peter realleges and incorporates by reference all of the foregoing allegations of this complaint;

62.  Plaintiff Peter challenges the provisions of the HRS that prohibits the issuance of a PTA to adults who are "non-citizens" as defined herein and the fact that he cannot acquire, own or possess a firearm with a PTA;

---

[17] *Brown v. Board of Education*, 347 U.S. 483 (1954).
[18] *Brown v. Board of Education,* 349 U.S. 294 (1955).

63.  Plaintiff Peter challenges the provisions of the HRS that prohibit him from acquiring, buying, owning and or possessing firearms because he is not a United States citizen, national or lawful permanent resident of the United States;

64.  Plaintiff Peter does not own any firearms;

65.  Plaintiff Peter is not disqualified under Hawaii or federal law from owning, possessing or carrying a firearm, apart from the challenged statutes that prohibit him receiving a PTA and acquiring, buying, owning, and possessing a firearm;

66.  Plaintiff Peter has not applied for a PTA because to do so in the face of the challenged statute that prohibits adults who are not United States citizens, nationals or lawful permanent residents from being issued a PTA would be futile;

67.  Plaintiff Peter desires, intends, and would apply for a PTA to acquire, buy, own, and possess a firearm and desires, intends, and would acquire, purchase, own and possess a firearm but for the challenged statutes that prohibit the issuance of a PTA to him because he is not a United States citizen, national or lawful permanent resident and also prohibit his ownership, purchase and possession of a firearm due to his not being a United States citizen, national or lawful permanent resident and the resultant criminal prosecution that would follow if he acquired, purchased, owned and possessed a firearm and ammunition without having first obtained a PTA;

68. Plaintiff Peter does not have an active, unexpired hunter's permit/license;

69. Plaintiff Peter is not a member of law enforcement nor has he ever been;

70. Plaintiff Peter is not a member of the armed services nor has he ever been;

71. Plaintiff Peter desires and intends to purchase a firearm for lawful purposes and would do so but for the State's adult "non-citizen" prohibitions;

72.  Plaintiff Peter has no criminal history;

73. Plaintiff Peter has no disqualifying mental health history;

74.  Plaintiff Billy Peter was born in Micronesia on March 16, 1976, on the island of Weno which is in the State of Chuuk;

75.  Plaintiff Peter is a Micronesian citizen;

76.  Plaintiff Peter is not a United States citizen;

77.  Plaintiff Peter is not a United States national;

78.  Plaintiff Peter is not a United States lawful permanent resident;

79.  Plaintiff Peter has no permanent allegiance to the United States of America nor does he owe a permanent allegiance to the United States of America;

80.  Plaintiff Peter is lawfully in the United States of America pursuant to the Compact of Free Association between the United States of America and the Federated States of Micronesia;

81.  Plaintiff Peter has been in the United States and lived in Hawaii for more than the last decade;

82.  Plaintiff Peter moved to Hawaii in 1996;

83.  Plaintiff Peter has lived continuously in Hawaii ever since he moved there;

84.  Plaintiff Peter met his wife in the United States, and they have been married since 2008;

85.  Plaintiff Peter has one daughter who was born in the United States and is a U.S. citizen;

86.  Plaintiff Peter is employed as a maintenance worker for Kamehameha schools.

87.  Plaintiff Peter has worked there for over six years;

88.  Plaintiff Peter also works for Enterprise Rental detailing cars;

89.  Plaintiff Peter has worked at Enterprise Rental for over four years;

90.  In April of 2024, Plaintiff Peter went to the Honolulu Police Department ("HPD") to apply for a permit to acquire. He spoke to a police officer and attempted to apply. He was told that he is not qualified to apply for a permit to acquire due to his immigration status as a COFA alien.  A few weeks after he went to HPD, he received a call from a police officer at HPD. They told him to come back with all his immigration paperwork so they could inspect it.  The next day Plaintiff Peter went to HPD with his I-94, which is his immigration paperwork.  An officer at HPD told him that his paperwork was "no good" and he needed a green card to own a firearm[19].  Plaintiff Peter would own and purchase firearms but for Hawaii law;

---

[19] "Green card" is a synonym for lawful permanent resident.

91.  Plaintiff Peter completed a handgun safety course in 2024 and is thus qualified to acquire a handgun, see Exhibit 2;

92. Except for the challenged statutes prohibiting his right to acquire, purchase, own, or possess any firearm due solely to his being a "non-citizen", COFA alien, and his reasonable fear of criminal prosecution for violating that law, Plaintiff Peter would immediately purchase, acquire, own and/or possess a firearm within Hawaii for self-defense and other lawful purposes and could otherwise lawfully do so, but for the challenged prohibitions.

**VII**

**CONTEXT RELATED TO ALL CLAIMS**

93.  The State of Hawaii has still not received the United States Supreme Court's clear message as to the depth and scope of the Second Amendment's protections. Prior to *Bruen*, the State had treated, for more than a century, the Second Amendment as dead, buried and forgotten.  Once *Bruen* was decided the State issued new burdensome regulations.  Notwithstanding the United States Constitution, the Second Amendment and binding Supreme Court precedent, the State continues to find ways to deprive individuals of their fundamental and constitutionally protected right to acquire and possess arms and ammunition – merely because it views it as a disfavored right.

94. For purposes of all Counts and Claims the Defendant has acted under "color of state law" within the meaning of Section 1983.

95.  Plaintiff does not concede that any permit is required to acquire, own, purchase or possess a firearm;

96.  To the extent that a permit or license is needed to acquire, purchase, or own a firearm, which Plaintiff does not concede is constitutional, denial cannot be because an adult, who is lawfully in the United States, is not a United States citizen, national or lawful permanent resident, but is a COFA alien;

## VIII

## (DECLARATORY JUDGMENT)

97. Plaintiff repeats and realleges the allegations of the preceding paragraphs as if set forth herein;

98. The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. 2201(a);

99. Absent a declaratory judgment, there is a substantial likelihood that Plaintiff will suffer irreparable injury in the future;

100. There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment;

101. This Court possesses an independent basis for jurisdiction over the parties;

102. Plaintiff seeks a judgment declaring that the challenged statutes, specified herein, are facially unconstitutional under the Second Amendment and Fourteenth Amendment, to the extent they prohibit COFA aliens from obtaining a PTA, acquiring, obtaining, owning and possessing firearms;

103. Alternatively, a declaration that the challenged statutes, as specified herein, are unconstitutional *as-applied* to the Plaintiff;

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that judgment be entered in his favor and against Defendant as follows:

1.      Declare, facially, to Plaintiff, that HRS §§134-2(a), 134-2(d)(1), and 134-2(h) , and all related law, policies, enforcement practices, and customs, as well as Defendant's enforcement of the same, violate the right to keep and bear arms secured by the Second and Fourteenth Amendments to the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment, and are therefore unconstitutional, to the extent they prohibit COFA aliens from owning firearms or otherwise make it more difficult for a COFA alien to own a firearm compared to a U.S. citizen, U.S. national or a lawful permanent resident;

2.     Preliminarily, and thereafter permanently, enjoin Defendant, her officers, agents, servants, employees, and all persons in active concert or participation with her who receive actual notice of the injunction, from enforcing Defendant's Hawaii Revised Statutes, as specified herein, §§134-2(a), 134-2(d)(1), and 134-2(h), all their derivative regulations, and all related laws, policies, and procedures that would impeded or criminalize the Plaintiff in the exercise of his right to keep and bear arms, facially to the extent they prohibit COFA aliens from owning firearms or otherwise make it more difficult for a COFA alien to own a firearm compared to a U.S. citizen, U.S. National, or a lawful permanent resident;

3.     Alternatively, declare that HRS §§134-2(a), 134-2(d)(1), and 134-2(h) , and all related law, policies, enforcement practices, and customs, as well as Defendant's enforcement of the same, *as-applied* to the Plaintiff, violates Plaintiff's right to keep and bear arms secured by the Second and Fourteenth Amendments to the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

4.     Alternatively, preliminarily, and thereafter permanently, enjoin Defendant, her officers, agents, servants, employees, and all persons in active concert or participation with her who receive actual notice of the injunction, from enforcing against Plaintiff, Defendant's Hawaii Revised Statutes, §§134-2(a), 134-2(d)(1), and 134-2(h), as specified herein, all their derivative regulations, and all related

laws, policies, and procedures that would impeded or criminalize the Plaintiff, *as-applied* to him;

5.    Award Plaintiff's nominal damages, and pursuant to 42 U.S.C. §1988, costs, attorney fees and expenses to the extent permitted; and

6.    Grant any and all other equitable and/or legal remedies this Court may see fit.

Dated: November 27, 2024.

Respectfully submitted,


/s/ *Kevin O'Grady*
Kevin Gerard O'Grady

Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com


 /s/ *Alan Beck*
Alan Alexander Beck

Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com
Counsel for Plaintiff

# VERIFICATION

I, Billy Peter, declare as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on November 25, 2024

BILLY PETER